Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

United States District Court
Southern District of Texas
FILED

AUG 2 9 2008

Michael N. Milby, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNSEALED
PER ARREST

9/3/08

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED UNDER SEAL** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **H-08-597** |
| v. | ) | Criminal No. _____ |
| | ) | |
| ALBERT JACKSON STANLEY, | ) | 18 U.S.C. § 371 (Counts 1 & 2) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INFORMATION

The United States charges:

### General Allegations

At all times material to this Information, unless otherwise stated:

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of obtaining or retaining business for, or directing business to, any person.

1

## Relevant Entities and Individuals

### *The Defendant and His Employer*

2.     Defendant ALBERT JACKSON STANLEY was a United States citizen and a resident of Houston, Texas.  From in or about March 1991, until in or about June 2004, STANLEY served in various capacities as an officer and/or director of "EPC Contractor A" and its successor company, "EPC Contractor A1."  STANLEY was a "domestic concern" and an officer, employee, and agent of a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

3.     Both EPC Contractor A and EPC Contractor A1 were engaged in the business of providing engineering, procurement, and construction ("EPC") services around the world, including designing and building liquefied natural gas ("LNG") production plants.  Both were incorporated in Delaware and headquartered in Houston, Texas.  As such, both were "domestic concerns" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

### *The Joint Venture, Its Members, and Related Entities*

4.     "Joint Venture" was a four-company joint venture consisting of EPC Contractor A and then EPC Contractor A1, and three other companies referred to herein as "EPC Contractor B," "EPC Contractor C," and "EPC

2

Contractor D." The Steering Committee of Joint Venture consisted of high level executives from each of the four joint venture companies, including STANLEY. Pursuant to a joint venture agreement, the Steering Committee made major decisions on behalf of Joint Venture, including whether to hire agents to assist Joint Venture in winning EPC contracts, whom to hire as agents, and how much to pay the agents. Profits, revenues, and expenses, including the cost of agents, were shared equally among the four joint venture partners.

5.      "U.K. Subsidiary" was a corporation organized under the laws of the United Kingdom. U.K. Subsidiary was 55% owned by EPC Contractor A and then EPC Contractor A1, and 45% owned by EPC Contractor D.

6.      Joint Venture operated through three Portuguese corporations based in Madeira, Portugal: "Madeira Company 1," "Madeira Company 2," and "Madeira Company 3." Madeira Company 1 and Madeira Company 2 each were owned equally by the four joint venture companies. Madeira Company 3, the entity that Joint Venture used to enter into consulting agreements with Joint Venture's agents, was 50% owned by U.K. Subsidiary, 25% owned by EPC Contractor B, and 25% owned by EPC Contractor C.

### *The Joint Venture's Agents*

7.     "Consultant A" was a citizen of the United Kingdom and a resident of London, England.  Joint Venture hired Consultant A to help it obtain business in Nigeria, including by offering to pay and paying bribes to high-level Nigerian government officials.  Consultant A was an agent of Joint Venture and of each of the joint venture companies.

8.     "Consulting Company A" was a Gibraltar corporation that Consultant A used as a corporate vehicle to sign agent contracts with and receive payments from Joint Venture.  Before Joint Venture stopped paying Consulting Company A in January 2004, Joint Venture paid Consulting Company A over $130 million for use in bribing Nigerian government officials.  Consulting Company A was an agent of Joint Venture and of each of the joint venture companies.

9.     Consulting Company B was a global trading company headquartered in Tokyo, Japan.  Joint Venture hired Consulting Company B to help it obtain business in Nigeria, including by offering to pay and paying bribes to Nigerian government officials.  Before Joint Venture stopped paying Consulting Company B in June 2004, Joint Venture paid Consulting Company B over $50 million for use in bribing Nigerian government

officials. Consulting Company B was an agent of Joint Venture and of each of its member companies.

***The Nigerian Government Entities***

10.    The Nigerian National Petroleum Corporation ("NNPC") was a government-owned company charged with development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry. NNPC was a shareholder in certain joint ventures with multinational oil companies. NNPC was an entity and instrumentality of the Government of Nigeria, within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Officers and employees of NNPC were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

11.    Nigeria LNG Limited ("NLNG") was created by the Nigerian government to develop an LNG facility on Bonny Island, Nigeria ("the Bonny Island Project") and was the entity that awarded the related EPC contracts. The largest shareholder of NLNG was NNPC, which owned 49% of NLNG. The other owners of NLNG were multinational oil companies. Through the NLNG board members appointed by NNPC, the Nigerian government exercised control over NLNG, including but not limited to the ability to block the award of EPC contracts. NLNG was an entity and

instrumentality of the Government of Nigeria, within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Officers and employees of NLNG were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

### The Bonny Island Project

12.    Between 1995 and 2004, Joint Venture was awarded four EPC contracts to build the Bonny Island Project. The Bonny Island Project was constructed in four phases, with each phase corresponding to an EPC contract. An LNG "train" is the infrastructure necessary to pipe raw natural gas from wellheads, convert the raw gas to purified LNG, and deliver that LNG to a tanker. The first phase of the Bonny Island Project consisted of two trains (Trains 1 and 2), the second phase consisted of one train (Train 3), the third phase consisted of two trains (Trains 4 and 5), and the fourth phase consisted of one train (Train 6). The first EPC contract, covering Trains 1 and 2, was awarded to Joint Venture through a competitive international tender. The other three EPC contracts were awarded to Joint Venture on a sole-source, negotiated basis. The four EPC contracts awarded to Joint Venture collectively were valued at over $6 billion.

## COUNT 1

## Conspiracy to Violate the Foreign Corrupt Practices Act
## (18 U.S.C. § 371)

13.    Paragraphs 1 through 12 are realleged and incorporated by reference as though fully set forth herein.

14.    From at least in or around August 1994, though in or around June 2004, in the Southern District of Texas, and elsewhere, defendant ALBERT JACKSON STANLEY did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with Joint Venture, EPC Contractor B, EPC Contractor C, EPC Contractor D, officers and employees of the foregoing, Consultant A, Consulting Company A, Consulting Company B, and others, known and unknown, to commit offenses against the United States, that is, being a domestic concern and an officer, employee, and agent of EPC Contractor A and then EPC Contractor A1, both domestic concerns, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign official for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of

7

such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist STANLEY, Joint Venture, and others in obtaining and retaining business for and with, and directing business to, Joint Venture and others, in violation of Title 15, United States Code, Section 78dd-2(a).

## Purpose of the Conspiracy

15.    The purpose and object of the conspiracy was to make corrupt payments to officials of the executive branch of the Government of Nigeria, officials of NNPC, officials of NLNG, and others in order to obtain and retain business related to the Bonny Island Project.

## Manner and Means of the Conspiracy

16.    STANLEY and his co-conspirators employed various manner and means to carry out the conspiracy, including but not limited to the following:

a.    STANLEY and his co-conspirators held so-called "cultural meetings" in which they discussed, among other things, the use of particular agents to pay bribes to officials of the Government of Nigeria in

8

order to secure their support for Joint Venture to obtain and retain contracts to build the Bonny Island Project.

        b.     STANLEY and his co-conspirators agreed that Joint Venture would hire Consulting Company A to pay bribes to high-level Nigerian government officials, including top-level executive branch officials, and Consulting Company B to pay bribes to lower level Nigerian government officials, including employees of NLNG, in exchange for the officials' assistance in obtaining and retaining contracts to build the Bonny Island Project.

        c.     STANLEY and his co-conspirators caused Madeira Company 3 to execute consulting contracts with Consulting Company A and Consulting Company B providing for the payment of tens of millions of dollars in consulting fees in exchange for vaguely described marketing and advisory services, when in fact the primary purpose of the contracts was to facilitate the payment of bribes to Nigerian government officials.

        d.     Prior to NLNG's award to Joint Venture of the various EPC contracts, STANLEY and other co-conspirators met with three successive holders of a top-level office in the executive branch of the Government of Nigeria and negotiated with the office holders'

representatives regarding the amount of the bribes that Joint Venture would pay to the Nigerian government officials.

          e.      STANLEY and his co-conspirators caused wire transfers totaling approximately $132 million from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts in New York, New York, to be further credited to bank accounts in Switzerland and Monaco controlled by Consultant A for Consultant A to use to bribe Nigerian government officials.

          f.      On behalf of Joint Venture and the four joint venture companies, Consultant A wire transferred bribe payments to or for the benefit of various Nigerian government officials, including officials of the executive branch of the Government of Nigeria, NNPC, and NLNG, and for the benefit of a political party in Nigeria.

          g.      STANLEY and his co-conspirators caused wire transfers totaling over $50 million from Madeira Company 3's bank account in Amsterdam, The Netherlands, to Consulting Company B's bank account in Japan for Consulting Company B to use to bribe Nigerian government officials.

## Overt Acts

17.    In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

a.    On or about August 3, 1994, the U.K. Subsidiary salesperson responsible for the Bonny Island Project ("Salesperson A") sent a facsimile from London, England, to STANLEY in Houston, Texas, and to other co-conspirators stating, among other things, that STANLEY and other top executives of the joint venture companies had agreed to send a message "to the top man that we are ready to do business in the customary manner" and to ask Consulting Company B to secure support from the key individuals at the working level of NLNG.

b.    On or about November 2, 1994, Consultant A told Salesperson A that he had spoken with a senior official of the Ministry of Petroleum, that Consultant A's fee would be $60 million, that the first top-level executive branch official of the Government of Nigeria would get $40-45 million of that fee, that other Nigerian government officials would get $15-20 million of that fee, and that there would be a meeting between

11

STANLEY and the first top-level Nigerian executive branch official before any written agreement between Joint Venture and Consultant A.

        c.     On or about November 30, 1994, STANLEY and other co-conspirators met in Abuja, Nigeria, with the first top-level executive branch official of the Government of Nigeria to verify that the official was satisfied with Joint Venture using Consultant A as its agent and to confirm that the official wanted Joint Venture to negotiate with the senior official of the Ministry of Petroleum the bribes to Nigerian government officials.

        d.     On or about March 20, 1995, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $60 million to Consulting Company A if Joint Venture was awarded a contract to construct Trains 1 and 2 of the Bonny Island Project.

        e.     On or about December 15, 1995, Madeira Company 3 wire transferred $1.542 million to Consulting Company A, via a correspondent bank account in New York, New York, in payment of Consulting Company A's first invoice under the consulting agreement for Trains 1 and 2.

        f.     On or about April 9, 1996, Madeira Company 3 entered into an agreement with Consulting Company B whereby it agreed to pay

Consulting Company B $29 million for assisting Joint Venture in winning the contract to build Trains 1 and 2 of the Bonny Island Project.

g.    On or about May 1, 1997, STANLEY and other co-conspirators met in Abuja, Nigeria, with the first top-level executive branch official of the Government of Nigeria and requested that the official designate a representative with whom Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the first top-level executive branch official's support of the award of the Train 3 EPC contract.

h.    On or about February 28, 1999, STANLEY and other co-conspirators met in Abuja, Nigeria, with a second top-level executive branch official of the Government of Nigeria to request that the official designate a representative with whom Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the second top-level executive branch official's support of the award of the Train 3 EPC contract.

i.    On or about March 5, 1999, STANLEY and other co-conspirators met in London, England, with the representative designated by the second top-level executive branch official of the Government of Nigeria to negotiate the bribes to Nigerian government officials in exchange for the award of the Train 3 EPC contract.

13

j.      On or about March 18, 1999, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $32.5 million to Consulting Company A if Joint Venture was awarded a contract to construct Train 3 of the Bonny Island Project.

k.      On or about March 13, 2000, Madeira Company 3 entered into a consulting agreement with Consulting Company B promising to pay it $4 million in connection with Train 3.

l.      On or about November 11, 2001, STANLEY and a salesperson from EPC Contractor A1 met in Abuja, Nigeria, with a third top-level executive branch official of the Government of Nigeria and an NNPC official to request that the top-level executive branch official designate a representative with whom Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the third top-level executive branch official's support of the award of the Trains 4 and 5 EPC contract.

m.      On or about December 24, 2001, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $51 million to Consulting Company A if Joint Venture was awarded a contract to construct Trains 4 and 5 of the Bonny Island Project.

n.      On or about June 14, 2002, STANLEY and other members of Joint Venture's Steering Committee authorized Joint Venture to enter into an agreement with Consulting Company B for Trains 4 and 5 of the Bonny Island Project.

o.      On or about June 28, 2002, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $23 million to Consulting Company A if Joint Venture was awarded a contract to construct Train 6 of the Bonny Island Project.

p.      On or about June 15, 2004, Madeira Company 3 wire transferred $3 million to Consulting Company B via a correspondent bank account in New York, New York, in payment of one of Consulting Company B's invoices under the agreement for Trains 4 and 5.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2

### Conspiracy to Commit Mail and Wire Fraud
### (18 U.S.C. § 371)

18.      Paragraphs 2 and 3 are realleged and incorporated by reference as though fully set forth herein.

19.      "LNG Consultant" was a citizen of the United States and a citizen of Lebanon.  From in or about 1977, until in or about 1988, LNG

Consultant was a salesperson employed by EPC Contractor A responsible for LNG and other projects in the Middle East.  In or about 1988, LNG Consultant resigned from EPC Contractor A and became a consultant to EPC Contractor A and subsequently EPC Contractor A1, among other firms. At various times after 1988, LNG Consultant used corporate vehicles for his consulting business.

20.     With the assistance of STANLEY, LNG Consultant obtained, directly or indirectly, a series of lucrative consulting agreements with EPC Contractor A and EPC Contractor A1.  These agreements generally provided for the payment of a fixed $10 million success fee if the LNG plant project covered by the agreement was awarded to EPC Contractor A/EPC Contractor A1.

21.     Beginning no later than in or about December 1991, and continuing to in or about 2004, in the Southern District of Texas, and elsewhere, defendant ALBERT JACKSON STANLEY did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree, with LNG Consultant and others, known and unknown, to commit offenses against the United States, that is, to devise and attempt to devise a scheme and artifice to defraud and obtain money and property from EPC Contractor A, EPC Contractor A1, and others by means of false and fraudulent

pretenses, representations, and promises, and to defraud EPC Contractor A
and EPC Contractor A1 of their right to their employees' honest services,
and knowingly use the mails and interstate wires for the purpose of
executing such scheme and artifice, in violation of Title 18, United States
Code, Sections 1341, 1343, and 1346.

### Purpose of the Conspiracy

22.     The purpose and object of the conspiracy was for STANLEY
and LNG Consultant to unjustly enrich themselves by obtaining money and
property falsely and fraudulently from EPC Contractor A, EPC Contractor
A1, and others in the form of consulting fees which were paid, directly or
indirectly, to LNG Consultant and portions of which, in turn, were paid by
LNG Consultant to STANLEY as "kickbacks."

### Manner and Means of the Conspiracy

23.     STANLEY and his co-conspirators employed various manner
and means to carry out the conspiracy, including but not limited to the
following:

        a.      STANLEY caused EPC Contractor A and EPC
Contractor A1 to enter into lucrative consulting agreements with LNG
Consultant or companies designated and controlled by LNG Consultant in
connection with various LNG projects around the world.

b.    Pursuant to the consulting agreements, LNG Consultant or companies designated and controlled by LNG Consultant were paid tens of millions of dollars in "success" fees on LNG projects obtained by EPC Contractor A and EPC Contractor A1.

c.    LNG Consultant paid kickbacks to STANLEY out of the consulting fees that EPC Contractor A and EPC Contractor A1 had paid LNG Consultant or companies designated and controlled by LNG Consultant.

d.    STANLEY and LNG Consultant concealed from EPC Contractor A and EPC Contractor A1 that LNG Consultant was paying kickbacks to STANLEY out of consulting fees that EPC Contractor A and EPC Contractor A1 had paid LNG Consultant or companies designated and controlled by LNG Consultant.

e.    STANLEY and LNG Consultant caused the kickbacks to be routed through Swiss bank accounts, including through accounts held in the names of nominees and shell companies, in order to conceal their scheme.

### Overt Acts

24.    In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed or caused to be

committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

a. On or about April 7, 1992, STANLEY signed the EPC Contractor A approval form authorizing a $15 million consulting agreement between EPC Contractor A and a company designated by LNG Consultant ("Lebanese Consulting Company") for an LNG project in Malaysia.

b. On or about May 21, 1992, Lebanese Consulting Company wire transferred $1,374,750 from its Swiss bank account to a Swiss bank account controlled by STANLEY.

c. On or about January 22, 1996, STANLEY signed a consulting agreement between EPC Contractor A and a company designated and controlled by LNG Consultant ("BVI Consulting Company") providing, among other things, that EPC Contractor A would pay BVI Consulting Company a $10 million success fee in connection with Trains 1 and 2 of the Bonny Island LNG project in Nigeria.

d. On or about February 14, 1996, LNG Consultant wire transferred $1.2 million from his Swiss bank account to a Swiss bank account controlled by STANLEY.

e. On or about August 19, 1998, STANLEY signed a consulting agreement between EPC Contractor A and BVI Consulting

Company providing, among other things, that EPC Contractor A would pay BVI Consulting Company a $10 million success fee if an EPC contract to build an LNG plant in Malaysia was awarded to EPC Contractor A's consortium.

       f.     On or about June 1, 2001, STANLEY signed the EPC Contractor A1 approval form authorizing a $10 million consulting agreement between EPC Contractor A1 and BVI Consulting Company for an LNG project in Egypt.

       g.     On or about August 6, 2001, LNG Consultant caused $1.25 million to be wire transferred to a Swiss bank account controlled by STANLEY.

       h.     On or about August 20, 2001, STANLEY signed a consulting agreement between EPC Contractor A1 and BVI Consulting Company providing that EPC Contractor A1 would pay BVI Consulting Company a $10 million success fee if an LNG project in Yemen was awarded to EPC Contractor A1's consortium.

       i.     On or about April 13, 2003, in Houston, Texas, STANLEY signed a consulting agreement between EPC Contractor A1 and BVI Consulting Company providing that EPC Contractor A1 would pay

BVI Consulting Company a $10 million success fee if an LNG project in Indonesia was awarded to EPC Contractor A1's consortium.

       j.    On or about July 29, 2003, LNG Consultant received in BVI Consulting Company's bank account in Switzerland a $2.5 million wire transfer from EPC Contractor A1 pursuant to the consulting agreement for the Egypt LNG project.

       k.    In or about early 2004, STANLEY and LNG Consultant discussed cover stories they could use to explain STANLEY's receipt of payments from Lebanese Consulting Company and BVI Consulting Company.

All in violation of Title 18, United States Code, Section 371.

STEVEN A. TYRRELL, CHIEF
FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE


By: _William J. Stuckwisch_

William J. Stuckwisch
D.C. Bar No. 457278
Patrick F. Stokes
Maryland State Bar
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, Room 3428
Washington, DC 20005
Tel: (202) 353-2393
Fax: (202) 514-0152