UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

SEP - 3 2008

Michael N. Milby, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ALBERT JACKSON STANLEY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**REDACTED PURSUANT TO
E-GOVERNMENT ACT OF 2002**

Criminal No. H-08-597

## <u>PLEA AGREEMENT</u>

The United States of America, by and through Steven A. Tyrrell, Chief of
the Fraud Section, Criminal Division, United States Department of Justice, and
William J. Stuckwisch and Patrick F. Stokes, Trial Attorneys, and the Defendant,
Albert Jackson Stanley, by and through his counsel, Larry Veselka, pursuant to
Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, state that they have
entered into an agreement, the terms and conditions of which are as follows:

### The Defendant's Agreement

1. The Defendant agrees to waive Indictment and to plead guilty to an
Information (a copy of which is attached) charging him with two counts of
conspiracy to commit an offense against the United States, in violation of Title 18,

United States Code, Section 371.  Count 1 of the Information charges the

Defendant with conspiracy to violate the Foreign Corrupt Practices Act, in

violation of Title 15, United States Code, Section 78dd-2.  Count 2 of the

Information charges the Defendant with a conspiracy to commit mail and wire

fraud, in violation of Title 18, United States Code, Sections 1341, 1343, and 1346.

The Defendant, by entering this plea, agrees that he is waiving any right to have

the facts that the law makes essential to the punishment charged in the

Information, or proven to a jury or proven beyond a reasonable doubt.

2. Defendant agrees that this plea agreement binds only the Criminal

Division of the U.S. Department of Justice and the Defendant; it does not bind any

United States Attorney or any other Division of the Department of Justice.

### Punishment Range

3. The statutory maximum penalty for each violation of Title 18, United

States Code, Section 371, is imprisonment for a term of not more than five years

and a fine of not more than $250,000, or twice the gross pecuniary gain to the

Defendant or loss to the victim(s), whichever is greater.  The combined statutory

maximum term of imprisonment for the two counts is imprisonment for a term of

not more than ten years.  Additionally, the Defendant may receive a term of

supervised release after imprisonment of up to three years on each count.  Title 18,

United States Code, Sections 3559(a)(4) and 3583(b)(2).  The Defendant acknowledges and understands that should he violate conditions of supervised release which may be imposed as part of his sentence, then the Defendant may be imprisoned for an additional term of up to two years, without credit for time already served on the term of supervised release prior to such violation.  Title 18, United States Code, Sections 3559(a)(4) and 3583(e)(3).  The Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

## Mandatory Special Assessment

4.  Pursuant to Title 18, United States Code, Section 3013(a)(2)(A), immediately after sentencing, the Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction, for a total of two hundred dollars ($200.00). The payment will be by cashier's check or money order  payable to the Clerk of the United States District Court,  c/o District Clerk's Office, P.O. Box 61010, Houston, Texas  77208, Attention: Finance.

## Restitution, Forfeiture, and Fines

5.  This plea agreement is being entered into by the United States on the basis of the Defendant's express representation that the Defendant will make a full

and complete disclosure of all assets over which the Defendant exercises direct or indirect control, or in which the Defendant has any financial interest.

6. The Defendant agrees to make complete financial disclosure to the United States by truthfully executing a sworn financial statement by the deadline set by the United States, or if no deadline is set, no later than sentencing. The Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information. The Defendant agrees to discuss or answer any questions by the United States relating to the Defendant's complete financial disclosure.

7. The Defendant agrees to pay restitution to the victim(s) of Count 2 of the Information. The Defendant stipulates and agrees that as a result of his criminal conduct the victim, his former employer, incurred a monetary loss of $10.8 million. The Defendant and the United States agree to recommend that the Court order restitution of $10.8 million.

8. The parties contemplate that the United States will seek the transfer to the United States of certain of the Defendant's assets in the following bank accounts in Switzerland that have been frozen by the Swiss authorities and will

seek to apply those assets to satisfy, in whole or in part, the Court's restitution order: Credit Suisse (ZH) account number ███████████, in the name of Kirton Investments Inc.; Credit Suisse (ZH) account number ███████████, in the name of Black Eagle Foundation; and Credit Suisse (ZH) account number ███████████ ██ in the name of Meritco Investment S.A.  Upon entering his guilty plea, the Defendant agrees to waive all rights in, interest in, and title to the aforementioned accounts, to take all steps as requested by the United States to facilitate the transfer of the assets in the aforementioned accounts to the United States and the application of the assets to restitution, and to testify truthfully in any related proceeding.  The Defendant further agrees that the amount of restitution that can be paid using the assets in these accounts will be due and payable as soon as the assets are transferred to the United States and available for restitution.

9.  The Defendant further agrees to liquidate through an arms-length transaction his interest in the real property located at ███████████, ███████████████████████████, that he holds through Kirton Investments Inc., within six months of the date of the entry of his guilty plea, which time period may be extended by the United States, and to pay all or that portion necessary of the proceeds of the transaction, net of any transaction costs, to satisfy his obligation to make restitution under this agreement.  The

United States agrees not to bring further charges based on the transactions required by this paragraph.

10.  The Defendant understands that under the <u>United States Sentencing Guidelines</u>, the Court may order the Defendant to pay a fine to reimburse the government for the costs of any imprisonment or term of supervised release.  To the extent that the Court orders restitution consistent with paragraph 7, the United States agrees to recommend that the Court not impose a fine.

## Cooperation

11.  The parties understand this agreement carries the potential for a motion for departure under Section 5K1.1 of the <u>United States Sentencing Guidelines</u>.  The Defendant understands and agrees that whether such a motion is filed will be determined solely by the United States through the Fraud Section of the Criminal Division of the United States Department of Justice.  Should the Defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the <u>United States Sentencing Guidelines</u>. The Defendant understands and agrees that the United States will request that sentencing be deferred until his cooperation is complete.  During that time, the Defendant agrees to persist in his plea of guilty through sentencing and

to fully cooperate with the United States as described below.

12.  The Defendant understands and agrees that "fully cooperate," as used herein, includes providing all information relating to any criminal activity known to the Defendant, including providing assistance to foreign authorities at the direction of the United States.  The Defendant understands that this includes providing information about all state, federal, and foreign law offenses about which he has knowledge.  In that regard:

(a)    Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States, including in a proceeding in a foreign jurisdiction.  Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(b)    Defendant agrees to voluntarily attend any interviews and conferences as the United States may request on reasonable notice;

(c)    Defendant agrees to provide truthful, complete and accurate information and testimony and understands any false statements made by the Defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney can and will be prosecuted under the appropriate perjury, false statement or obstruction statutes;

(d)    Defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation.

(e)    Should the recommended departure, if any, not meet the Defendant's expectations, the Defendant understands he remains bound by the

terms of this agreement and cannot, for that reason alone, withdraw his plea.

## Waiver of Appeal

13. The Defendant is aware that Title 18, United States Code, Section 3742 affords a Defendant the right to appeal the sentence imposed. Additionally, the Defendant is aware that Title 28, United States Code, Section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. If the Court accepts the plea agreement pursuant to Rule 11(c)(1)(C) and sentences the Defendant to the agreed-upon sentence as set forth in paragraph 19, the Defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined, and the Defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding.

14. In agreeing to these waivers, the Defendant is aware that a sentence has not yet been determined by the Court. The Defendant is also aware that any promise, representation, or estimate of the possible sentencing range under the Sentencing Guidelines that he may have received from his counsel, the United States, or the Probation Office is a prediction, not a promise, and is not binding on the United States, the Probation Office, or the Court, other than as provided in

paragraph 19.  The Defendant further understands and agrees that the <u>United States Sentencing Guidelines</u> are "effectively advisory" to the Court.  *United States v. Booker*, 125 S.Ct. 738 (2005).  Accordingly, the Defendant understands that, although the Court must consult the <u>United States Sentencing Guidelines</u> and must take them into account when sentencing the Defendant, the Court is not bound to follow the <u>United States Sentencing Guidelines</u> and is not required to sentence the Defendant within the calculated guideline range.  However, if the Court accepts this plea agreement, the Court is bound by the sentencing provision in paragraph 19.

15.  The Defendant understands and agrees that all waivers contained in the agreement are made in exchange for the concessions made by the United States in this plea agreement.  If the Defendant instructs his attorney to file a notice of appeal of his sentence or of his conviction, or if the Defendant instructs his attorney to file any other post-conviction proceeding attacking his conviction or sentence, the Defendant understands that the United States will seek specific performance of the Defendant's waivers in this plea agreement of the Defendant's right to appeal his conviction or sentence and of the Defendant's right to file any post-conviction proceedings attacking his conviction or sentence.

### The United States' Agreements

16.  The United States agrees that, except as provided in this agreement, no further criminal charges will be brought against the Defendant for any act or offense in which he participated in his capacity as an officer and/or employee of EPC Contractor A or EPC Contractor A1, or for any act or offense relating to the Defendant's transactions with or use of the proceeds of the conspiracies charged, provided such conduct was disclosed to the United States by the Defendant prior to the date the Defendant executes this agreement.

### United States' Non-Waiver of Appeal

17.  The United States reserves the right to carry out its responsibilities under guidelines sentencing.  Specifically, the United States reserves the right:

(a)  to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

(b)  to set forth or dispute sentencing factors or facts material to sentencing;

(c)  to seek resolution of such factors or facts in conference with the Defendant's counsel and the Probation Office;

(d)  to file a pleading relating to these issues, in accordance with U.S.S.G. Section 6A1.2 and Title 18, United States Code, Section 3553(a); and

(e)  to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

18.  The Defendant is aware that the sentence will be imposed after consideration of the <u>United States Sentencing Guidelines</u> and <u>Policy Statements</u>, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a).  The United States and the Defendant agree that the applicable Sentencing Guidelines range exceeds 84 months' imprisonment.

19.  Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the United States and the Defendant agree that a term of imprisonment of 84 months is the appropriate disposition of the case.  The Defendant understands that, if the Court rejects the plea agreement, the Court must (i) inform the parties that the Court rejects the plea agreement, (ii) advise the Defendant personally that the Court is not required to follow the plea agreement and give the Defendant the opportunity to withdraw the plea, and (iii) advise the Defendant personally that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.  The Defendant agrees that he will not seek a sentence below 84 months' imprisonment, and the Defendant understands that except under the circumstances described in paragraph 20 below, the Court will be required to impose a sentence of 84 months'

imprisonment if the Court accepts the plea agreement.

20.  If the Defendant provides truthful, complete, and accurate information to the United States and fully cooperates with the United States pursuant to the plea agreement, then the United States in its sole and exclusive discretion may move the Court, pursuant to Section 5K1.1 of the United States Sentencing Guidelines and Title 18, United States Code, Section 3553(e), to depart downward from the 84-month agreed-upon sentence set forth in paragraph 19.  The Defendant agrees that he will not move for a downward departure on any grounds and that no such grounds are applicable.

### Rights at Trial

21.  The Defendant represents to the Court that he is satisfied that his attorneys have rendered effective assistance.  The Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement.  The Defendant understands that the rights of a defendant include the following:

(a)  If the Defendant persisted in a plea of not guilty to the charges, the Defendant would have the right to a speedy jury trial with the assistance of counsel.  The trial may be conducted by a judge sitting without a jury if the Defendant, the United States, and the court all agree.

(b)  At a trial, the United States would be required to present witnesses

and other evidence against the Defendant. The Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, the Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for the Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

(c)     At a trial, the Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the Defendant desired to do so, he could testify on his own behalf.

### Factual Basis for Guilty Plea

22.  The Defendant is pleading guilty because he <u>is</u> guilty of the charges contained in Counts 1 and 2 of the Information. If this case were to proceed to trial, the United States would prove each element of the offenses charged in the Information beyond a reasonable doubt. The Defendant understands that the United States would submit testimony and physical and documentary evidence that would establish the following facts, among others:

### The Defendant

a.     At all times relevant to the Information, STANLEY was a United States citizen and a resident of Houston, Texas. STANLEY and his co-conspirators committed acts in furtherance of the schemes described below in Houston, Texas. From in or about March 1991, until in or about June 2004, STANLEY served in various capacities as an officer and/or director of EPC Contractor A[1] and its successor

---

[1]     This factual basis refers to persons and entities, such as EPC Contractor A, using the same terms as are used in the Information to which STANLEY is pleading guilty. STANLEY

company, EPC Contractor A1.

## **The Bonny Island Bribery Scheme**

b.    At all times relevant to the Information, STANLEY was one of the executives at EPC Contractor A and then EPC Contractor A1 with responsibility for obtaining the EPC contracts to build the Bonny Island Project, a series of four contracts awarded between 1995 and 2004 (corresponding to Trains 1 and 2; Train 3; Trains 4 and 5; and Train 6), collectively valued at over $6 billion, to build liquefied natural gas ("LNG") facilities on Bonny Island, Nigeria.  STANLEY also was EPC Contractor A/EPC Contractor A1's senior representative on the Steering Committee of Joint Venture.  The Steering Committee made major decisions on behalf of Joint Venture, including authorizing the retention and compensation of agents.

c.    STANLEY believed that support of Nigerian government officials, including top-level executive branch officials, high-level Petroleum Ministry officials, NNPC officials, and NLNG officials and employees, was necessary for the Bonny Island Project EPC Contracts to be awarded to Joint Venture.  STANLEY also knew that it was unlawful under U.S. law to bribe foreign government officials.

d.    In 1994, 1999, 2001, and 2002, STANLEY authorized the hiring of Consultant A and Consulting Company A by Joint Venture, expecting that Consultant A and Consulting Company A would pay bribes to high-level Nigerian government officials to assist Joint Venture, EPC Contractor A, EPC Contractor A1, and others in winning the EPC contracts to build the Bonny Island Project.  In 1996, 1999, and 2001, STANLEY also authorized the hiring of Consulting Company B by Joint Venture, expecting that Consulting Company B would pay bribes to lower level Nigerian government officials to assist Joint Venture, EPC Contractor A, EPC Contractor A1, and others in winning the EPC contracts to build the Bonny Island Project.

has reviewed the "Relevant Entities and Individuals" section of the Information (paragraphs 2-12) and admits the facts alleged therein based on his personal knowledge and/or admits that the government would be able to prove the facts alleged therein at a trial.

e.     At crucial junctures in the life of the Bonny Island Project,
       STANLEY and others met with three successive holders of a top-
       level office in the executive branch of the Government of Nigeria to
       ask the office holder to designate a representative with whom Joint
       Venture should negotiate bribes to Nigerian government officials.  On
       or about November 30, 1994, STANLEY and others met with the first
       such top-level executive branch official in Abuja, Nigeria, to ask the
       official to nominate a representative with whom Joint Venture should
       negotiate the fees that Joint Venture would pay Consulting Company
       A to pass on as bribes to Nigerian government officials.  This top-
       level executive branch official designated a high-level official of the
       Ministry of Petroleum as his representative.  Thereafter, as EPC
       Contractor A's senior representative on Joint Venture's Steering
       Committee, STANLEY authorized Joint Venture to enter into a
       consulting agreement with Consulting Company A providing for
       Joint Venture to pay it $60 million if the EPC contract for Trains 1
       and 2 was awarded to Joint Venture.  STANLEY intended that the
       $60 million fee would be used, in part, to pay bribes to Nigerian
       government officials.

f.     On or about May 1, 1997, STANLEY and others again met in Abuja,
       Nigeria, with the top-level executive branch official to ask the official
       to nominate a representative with whom Joint Venture should
       negotiate bribes to Nigerian government officials in exchange for the
       award to Joint Venture of an EPC contract to build Train 3.  At the
       meeting, the top-level executive branch official designated a senior
       executive branch official as his representative.

g.     On or about February 28, 1999, STANLEY and others met in Abuja,
       Nigeria, with a second top-level executive branch official.  At the
       meeting, STANLEY asked the second top-level executive branch
       official to nominate a representative with whom Joint Venture should
       negotiate bribes to Nigerian government officials in exchange for the
       award to Joint Venture of an EPC contract to build Train 3.  At the
       meeting, the second top-level executive branch official designated
       one of his advisers as his representative.

h.   On or about March 5, 1999, STANLEY and other co-conspirators met at a hotel in London, England, with the adviser designated by the second top-level executive branch official to negotiate the amount of bribes to be paid to the second top-level executive branch official and other Nigerian government officials in exchange for the award to Joint Venture of an EPC contract to build Train 3. The amount negotiated with the representative formed the basis for the $32.5 million fee that Joint Venture promised to pay Consulting Company A. As EPC Contractor A1's senior representative on Joint Venture's Steering Committee, STANLEY authorized Joint Venture to enter into the consulting agreement with Consulting Company A, intending that the $32.5 million fee would be used, in part, to pay bribes to Nigerian government officials.

i.   On or about November 11, 2001, STANLEY and other co-conspirators met in Abuja, Nigeria, with a third top-level executive branch official to ask the official to nominate a representative with whom Joint Venture should negotiate bribes to Nigerian government officials in exchange for the award to Joint Venture of an EPC contract to build Trains 4 and 5. At the meeting, the third top-level executive branch official designated a top-level official of NNPC as his representative. As EPC Contractor A1's senior representative on Joint Venture's Steering Committee, STANLEY authorized Joint Venture to enter into a consulting agreement with Consulting Company A providing for Joint Venture to pay it $51 million if the EPC contract for Trains 4 and 5 was awarded to Joint Venture. At the time, STANLEY intended that the $51 million fee would be used, in part, to pay bribes to Nigerian government officials.

j.   In or about June 2002, STANLEY authorized Joint Venture to enter into a consulting agreement with Consulting Company A providing for Joint Venture to pay it $23 million if the EPC contract for Train 6 was awarded to Joint Venture. At the time, STANLEY intended that the $23 million fee would be used, in part, to pay bribes to Nigerian government officials.

### The LNG Consultant Kickback Scheme

k.      LNG Consultant was a salesperson at EPC Contractor A until in or about 1988, when he resigned as an employee and became a consultant to EPC Contractor A.  In or about 1991, STANLEY and LNG Consultant agreed that (I) STANLEY would arrange for LNG Consultant to receive lucrative consulting agreements with EPC Contractor A and, later, EPC Contractor A1, and (ii) LNG Consultant would "kick back" to STANLEY a portion of the consulting fees that LNG Consultant received from EPC Contractor A and EPC Contractor A1.  STANLEY and LNG Consultant concealed the kickback scheme from EPC Contractor A, EPC Contractor A's parent company, EPC Contractor A1, and EPC Contractor A1's parent company.  At the time, STANLEY knew that the codes of conduct of the parent companies of EPC Contractor A and EPC Contractor A1 prohibited these payments.  STANLEY also knew that other officers and employees of EPC Contractor A, EPC Contractor A1, and their respective parent companies would not have approved consulting contracts with companies related to LNG Consultant if they had known about the kickback scheme.

l.      During the ensuing years, as described below, LNG Consultant or companies he designated and controlled, with the assistance of STANLEY, obtained a series of lucrative consulting agreements with EPC Contractor A and EPC Contractor A1.  These agreements generally provided for the payment of a fixed $10 million success fee if the LNG plant project covered by the agreement was awarded to EPC Contractor A/EPC Contractor A1.

m.      In April 1992, STANLEY caused EPC Contractor A to enter into a consulting agreement for the Malaysia Dua LNG project with a Lebanese consulting company designated and controlled by LNG Consultant ("Lebanese Consulting Company").  Pursuant to the consulting agreement, EPC Contractor A paid the Lebanese Consulting Company $15 million.  LNG Consultant kicked back to STANLEY a total of $4.75 million by directing the Lebanese Consulting Company to wire transfer payments to a Swiss bank

account controlled by STANLEY after receiving each installment payment from EPC Contractor A.

n.    In January 1996, STANLEY caused EPC Contractor A to enter into a consulting agreement for Trains 1 and 2 of the Bonny Island Project with a second company designated and controlled by LNG Consultant ("BVI Consulting Company"). Pursuant to the consulting agreement, EPC Contractor A paid BVI Consulting Company $10 million. LNG Consultant kicked back to STANLEY a total of $1.95 million by wire transferring payments to a Swiss bank account controlled by STANLEY after receiving each installment payment from EPC Contractor A.

o.    In or about August 1998, STANLEY caused EPC Contractor A to enter into a consulting agreement for the Malaysia Tiga LNG project with BVI Consulting Company. Pursuant to the consulting agreement, EPC Contractor A1, as the successor company to EPC Contractor A, paid BVI Consulting Company $13.3 million. LNG Consultant kicked back to STANLEY a total of $4.1 million by causing wire transfers to the Swiss bank account of Amal Development Inc., a Panama corporation controlled by STANLEY.

p.    In or about June 2001, STANLEY caused EPC Contractor A1 to enter into consulting agreements for the Yemen LNG project and the Egypt LNG project with BVI Consulting Company. In or about April 2003, STANLEY caused EPC Contractor A1 to enter into a consulting agreement for the Indonesia LNG project with BVI Consulting Company. In each of these agreements, EPC Contractor A1 promised to pay BVI Consulting Company a success fee of $10 million. Pursuant to the agreement for the Egypt LNG project, EPC Contractor A1 paid BVI Consulting Company a total of $10 million between February 2002 and July 2003.

q.    In or about 2004, STANLEY talked separately with LNG Consultant and with one of LNG Consultant's colleagues about potential cover stories that could be used to explain STANLEY's receipt of payments from the Lebanese consulting company and BVI Consulting

Company.

## Breach of Plea Agreement

23.  If the Defendant should fail in any way to fulfill completely all of the

obligations under this plea agreement, the United States will be released from its

obligations under the plea agreement, and the Defendant's plea and sentence will

stand.  If at any time the Defendant retains, conceals or disposes of assets in

violation of this plea agreement, or if the Defendant knowingly withholds

evidence or is otherwise not completely truthful with the United States, then the

United States may move the Court to set aside the guilty plea and reinstate

prosecution.  Any information and documents that have been disclosed by the

Defendant, whether prior or subsequent to this plea agreement, and all leads

derived therefrom, will be used against the Defendant in any prosecution.

24.  Whether the Defendant has breached any provision of this plea

agreement shall be determined solely by the United States through the Fraud

Section of the Criminal Division of the United States Department of Justice,

whose judgment in that regard is final.

## Complete Agreement

25.  This written plea agreement, consisting of 23 pages, including the

attached addendum of the Defendant and his attorney, constitutes the complete

plea agreement between the United States, the Defendant, and his counsel.  No promises or representations have been made by the United States except as set forth in writing in this plea agreement.  The Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

26.  Any modification of this plea agreement must be in writing and signed by all parties.

Filed at Houston, Texas, on 9/3, 2008.

Albert Jackson Stanley
Defendant

Subscribed and sworn to before me on September 3, 2008.

MICHAEL N. MILBY
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

STEVEN A. TYRRELL, CHIEF
FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

William J. Stuckwisch
D.C. Bar No. 457278
Patrick F. Stokes
Maryland State Bar
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Ave, Rm 3428
Washington, DC 20005
Tel.: (202) 353-2393
Fax.: (202) 514-0152


Larry Veselka
Attorney for Defendant Albert Jackson Stanley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. H-08-597 |
| | ) | |
| ALBERT JACKSON STANLEY, | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT - ADDENDUM

I have fully explained to the Defendant his rights with respect to the

Information.  I have reviewed the provisions of the <u>United States Sentencing

Guidelines</u> and I have fully and carefully explained to the Defendant the

provisions of those Guidelines which may apply in this case.  I have also

explained to the Defendant that the Sentencing Guidelines are only advisory.

Further, I have carefully reviewed every part of this plea agreement with the

Defendant.  To my knowledge, the Defendant's decision to enter into this

agreement is an informed and voluntary one.

_____          Sept 3, 2008
Attorney for the Defendant                        Date

I have consulted with my attorney and fully understand all my rights with respect to the Information against me.  My attorney has fully explained and I understand all my rights with respect to the provisions of the <u>United States Sentencing Guidelines</u> which may apply in my case.  I have read and carefully reviewed every part of this plea agreement with my attorney.  I understand this agreement and I voluntarily agree to its terms.

_Albert Jackson Stanley_
Defendant

_9/3/08_
Date